# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-244 (CKK)** |
| **v.** | : | |
| | : | |
| **ANTHONY ALFRED GRIFFITH, SR.,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Anthony Alfred Griffith, Sr. to 13 months of incarceration (midpoint of the 10-16 month sentencing guidelines range as calculated by the government and probation), 12 months supervised release, 60 hours of community service, and $500 in restitution.

## I. Introduction

Defendant Anthony Alfred Griffith Sr. ("Griffith") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On May 16, 2023, following a five-day bench trial in March 2023, the Court found Griffith guilty of each of the four counts of the indictment in which he had been charged:

- Count Two: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

- Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

- Count Four: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and

- Count Five: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).[2]

As explained herein, a sentence of 13 months of incarceration, the middle of the Guidelines range as calculated by the government and the Probation Office, is appropriate in this case because Griffith: (1) encouraged nearby members of the crowd marching to the Capitol by yelling "Freedom!"; (2) approached the scaffolding on the West Plaza to photograph police officers defending the Capitol in riot gear; (3) ignored numerous obvious indicia that the Capitol Building and grounds were restricted, including police officers in riot gear deploying percussive rounds and tear gas, police lines barricading doors and broken windows, and being directly told that someone had been shot; (4) shouted at police officers guarding a broken window and demanded that they "open the door!"; (5) watched and listened as other rioters repeatedly slammed the Senate Wing

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Only Griffith's co-defendant, his 28-year-old apprentice Jerry Ryals, was charged in Count One, charging a violation of 18 U.S.C. § 1512(c)(2).

Doors against the wall to destroy them in an effort to gain entry; (7) entered the Capitol Building (for the first time) through a different entrance and entered the ransacked Parliamentarian's office; (8) returned to the Senate Wing Doors to enter the Capitol a second time and stepped around shattered furniture to push deeper into the Capitol; (9) demonstrated in the Crypt with his apprentice, remaining in the building for approximately 45 minutes; and (10) repeatedly provided false and misleading testimony during his trial testimony.

The Court must also consider that Griffith's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol and disruption of the proceedings. Here, the facts and circumstances of Griffith's crimes support a sentence of 13 months of incarceration, 12 months supervised release, 60 hours of community service, and $500 in restitution in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers the Court to the statement of facts filed in this case for a short summary of the attack on the United States Capitol when Congress met in a Joint Session on January 6, 2021, to certify the results of the November 3, 2020 presidential election and rioters sought to disrupt the peaceful transfer of power. *See* ECF 1-1.

*Griffith's Role in the January 6, 2021 Attack on the Capitol*

Griffith lives in Fort Gibson, Oklahoma. On January 5, 2021, he traveled with codefendant Jerry Ryals and another friend from Oklahoma to Washington, D.C. to attend the "Stop the Steal" rally. Ryals was Griffith's employee and apprentice electrician.[3]

After Trump's speech, Griffith and his two friends walked in a crowd towards the Capitol. As they marched, members of the crowd chanted "stop the steal." On a few occasions, when the crowd fell silent, Griffith would yell "FREEDOM!"

Griffith, Ryals, and their companion entered the Capitol Grounds, a restricted area, on the west side of the Capitol. As Griffith approached the Capitol, he witnessed a line of officers in riot gear attempting to keep the mob from advancing further onto the Lower West Terrace of the Capitol.

---

[3] Ryals, accepted a plea agreement to Count One of the superseding information charging a violation of 18 U.S.C. 231 § (a)(3) and was sentenced by this Court to 9 months incarceration on October 18, 2022.



*Image 1:* *Photo taken by Griffith of West Front (Government Trial Exhibit 302B)*

Likewise, he observed that police officers were attempting to repel the mob by means of sprays, percussive rounds, and chemical munitions. He observed other rioters climbing on the scaffolding that made up the inaugural stage. While watching those rioters, he listened as others around him chanted, "Our House!", "Drain the swamp!", and "We will not concede." Nonetheless, Griffith proceeded up a set of steps on the west side of the Capitol near the temporary scaffolding and into a plaza on the northwest side of the Capitol.

Ryals proceeded in advance of Griffith, and Griffith–who repeatedly claimed to feel responsible for his apprentice Ryals–followed. The two met on the Upper West Terrace outside of the Senate Wing Doors. Griffith began videotaping the riotous mob attempting to break into the Capitol. Ryals recorded and narrated his own video while standing next to Griffith. As he stood next to Griffith, Ryals said, "We definitely have enough people to overthrow this bitch. They don't

stand a fucking chance. We got the fucking doors open up there I guess. We're working our way in slowly but surely." (Government Sentencing Exhibit 1).



*Image 2:* *Still of* Griffith *captured on Ryals' video as Ryals exclaims, "[w]e definitely have enough people to overthrow this bitch"(Government Trial Exhibit 314)*

Sometime thereafter, the two once again separated. While Ryals moved toward the Parliamentarian Door, Griffith moved closer to the Senate Wing Doors until he stood just outside one of the adjoining windows that had been shattered by other rioters and was guarded by multiple uniformed police officers. While there, Griffith observed rioters attempting to rip the door off its hinges, while others chanted, "Stop the Steal!" The door alarm rang incessantly. (Government Sentencing Exhibit 2).



***Image 3:*** *Still of Griffith watching as the Senate Wing Doors are damaged (Government Trial Exhibit 505)*

Griffith looked inside through the broken windows and saw a group of Capitol police inside the building, facing the crowd outside the windows and holding their shields and batons in front of them. At approximately 2:38 p.m., while standing at the broken window, Griffith repeatedly screamed at the officers inside the window and—contrary to his sworn testimony—can be seen shouting "Open the door!" at them. (Government Sentencing Exhibit 3).



***Image 4:*** *Griffith arguing with police officers (Government Trial Exhibit 403)*

Just behind where Griffith stood demanding entry into the Capitol building, other rioters breached the Parliamentarian door. Shortly thereafter, Griffith left the Senate Wing Doors and walked the short distance to the now breached-Parliamentarian door, passing by the broken window to the Parliamentarian's office, a sign that stated, "Save USA Stop the Steal Stop the Fraud!", and a rioter trying to rinse chemical spray out of the eyes of another rioter. Griffith climbed up the stairs to the Parliamentarian door, filming with his phone as he went, and shouted with excitement as he entered the Capitol building for the first time.



*Image 5: Griffith's first entry into the Capitol (Government Trial Exhibit 505)*

Despite the blaring alarms and shattered glass, Griffith turned right into the Parliamentarian's office. By the time he entered, the office had been ransacked with papers and furniture strewn about and other rioters filling the room.



**Image 6:** *Griffith inside the Parliamentarian's Office (Government Trial Exhibit 501)*

Notwithstanding the obvious destruction in the Parliamentarian's office, upon exiting Griffith tried to make his way further into the Capitol building and only reversed course when the hallway proved impassible.



**Image 7:** *Griffith exiting the Parliamentarian's office (Government Trial Exhibit 404)*

Upon leaving the Capitol building through the Parliamentarian door, however, Griffith chose not to leave the Capitol grounds but instead elected to return to the Senate Wing Doors where he entered the Capitol building for a second time.



*Image 8:* *Griffith's second entry into the Capitol (Government Trial Exhibit 403)*

After entering, Griffith saw and stepped over broken furniture directly in front of him, while other members of the mob continued to shout and chant (including "Traitors!" and "Fight for Trump!"). Griffith observed another line of police officers wearing riot gear blocking the northern path towards the U.S. Senate Chamber. Eventually, Griffith walked deeper into the Capitol.



*Image 9: Griffith walking past broken furniture (Government Trial Exhibit 507)*

After leaving the vicinity of the Senate Wing Doors, he encountered a police officer who told him that someone had been shot.



*Image 10: Griffith encountering a police officer (Government Trial Exhibit 406)*

Even then, however, Griffith did not leave the Capitol Building. Instead, he continued further in and made his way to the Crypt. For the next twenty-five minutes, Griffith remained in the vicinity of the Crypt. He once again re-connected with Ryals and the two of them shouted and demonstrated in the Crypt, shouting "Freedom" and joining chants of "U.S.A.!" Only after police officers had sufficient numbers to begin clearing the building did Griffith exit for a final time at approximately 3:33 p.m.

Altogether, Griffith remained in the U.S. Capitol Building for approximately 45 minutes on January 6. He entered the building not once but twice.  While members of Congress and their staff evacuated the building or hid in fear, while police officers tried to maintain control despite being overwhelmed, and as the Capitol was in a state of lockdown, Griffith roamed the hallways.



*Image 11: Griffith (right) after entering the Capitol twice (Government Trial Exhibit 303)*

*Griffith's Trial Testimony*

Griffith testified at trial. He maintained that he thought it was lawful to enter and remain in the Capitol Building. He also admitted to hearing an alarm upon entering the Capitol and observing chemical spray, a ransacked office, broken glass, and other rioters breaking doors to enter the Capitol Building.

As the Court determined, Griffith's testimony that he thought it was lawful to enter and remain in the Capitol was not credible. Dkt. 142 at 8. Likewise incredible was Griffith's testimony that he observed two police officers standing behind a broken window but did not understand that they were there guarding it and instead did not "know what they were doing." 3/16/23 Trial Transcript at 799-800. Griffith also insisted that he was not shouting or pointing at those two officers and could not make out what he was saying to them on the video despite multiple viewings (3/16/23 Trans. 802-803; 815-819; 831-833).

That testimony was contradicted by video footage introduced into evidence showing Griffith shouting at police officers guarding a broken window near the Senate Wing Doors and demanding that they open the door. The Court found that Griffith's testimony about that video was not credible, explaining that "contrary to Defendant's testimony, Defendant can be seen shouting at a police officer inside the window, 'Open the door.'" Dkt. 142 at 7.

Other portions of Griffith's trial testimony were replete with self-serving contradictions. For example, he testified that while he remembered listening to the former President's speech on January 6, he did not recall what the former president spoke about or whether he spoke about the election. 3/16/23 Trial Transcript at 743-745. Likewise, he initially conceded a general understanding of the role Congress played in certifying the election on January 6, but later claimed, "I don't think I really realized—you know, the—Congress was there and all that." 3/16/23 Trial

Transcript at 751 and 879. Despite video and audio evidence, Griffith testified that he could not recall then numerous chants of "Stop the Steal" around him during his time on the Capitol grounds. 3/16/23 Trial Transcript at 772. Accordingly, the Court pointed to these and other examples as its basis to reject the credibility of Griffith's testimony, noting that it "discounts any of Griffith's self-serving statements" and "find[s] only his inculpatory statements credible because they are supported by other evidence." Dkt. 142 at 9.

*The Charges*

On May 16, 2023, following a bench trial, this Court returned a verdict of guilty on all four counts against Anthony Griffith:

- Count 2: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);
- Count 3: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);
- Count 4: Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and
- Count 5: Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

**III.    Statutory Penalties**

Griffith now faces a sentencing on each of counts of conviction set forth above. As noted by the U.S. Probation Office, the defendant faces up to 1 year of imprisonment, a fine of up to $100,000, and a mandatory special assessment of $25 for each violation of 18 U.S.C. § 1752 (Counts Two and Three) as well as an additional six months of imprisonment, a fine up to $5,000, and mandatory special assessment of $10 for each violation of 40 U.S.C. § 5104(e)(2) (Counts Four and Five).[4] As Counts Four and Five are Class B Misdemeanors, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[4] The Court may sentence a defendant to a total term of incarceration greater than 12 months incarceration—*i.e.*, run the terms consecutively—if the Court determines that such a sentence is

## IV.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Report (PSR) and the calculated guidelines range of 10-16 months' incarceration. PSR ¶84. However, the PSR mistakenly fails to include a full Guidelines analysis for both Counts to which the Guidelines apply—Counts Two and Three. Sections 1B.1(a)(1)-(3) of the Sentencing Guidelines describe the steps a sentencing court must follow to determine the Guidelines range, which includes determining the applicable Guideline for each count of conviction, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. U.S.S.G. § 1B1.1(a)(4) (analysis under U.S.S.G. § 1B1.1(a)(1)-

---

necessary to comply with the factors in 18 U.S.C. § 3553(a)(2), that, is, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.  U.S.S.G. §5G1.2(b), (d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, . . . the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."); 18 U.S.C. § 3584(b); *see also United States v. Lafayette*, 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

(3) must be "repeat[ed]" for "each count"). Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed for each count should the court "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR does not follow these steps. It concludes (see PSR ¶30) that Counts Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis is as follows:

<u>Count Two: 18 U.S.C. § 1752(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A)(vii) | Special offense characteristic | +2 |
| U.S.S.G. §3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **8** |

<u>Count Three: 18 U.S.C. § 1752(a)(2)</u>

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §3C1.1 | Obstructing the Administration of Justice | +2 |
| | **Total** | **12** |

| | |
|---|---|
| **Combined Offense Level** | **12** |
| Acceptance of Responsibility | 0 |
| **Total Offense Level:** | **12** |

Because Congress was the victim of both the Section 1752(a)(1) and the (a)(2) convictions, those counts group. *See* U.S.S.G. § 3D1.2(a) and (b). The offense level for the group is 12. *See* U.S.S.G. § 3D1.3.

Counts Four and Five are Class B misdemeanors, to which the Sentencing Guidelines do not apply. *See* PSR ¶29; 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); and U.S.S.G. § 1B1.9.

With respect to the application of § 3C1.1, the government and the U.S. Probation Office also agree that this Court should apply Section 3C1.1's two-level enhancement for obstruction of

justice. *See* U.S.S.G. § 3C1.1. Application Note 4(B) of Section 3C1.1 states that "committing . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies. *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993) (confirming that perjury merits the obstruction enhancement under Section 3C1.1); *see* U.S.S.G. § 1B1.1(b) ("The court shall then consider . . . any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence.").[5]

Here, the evidence is more than sufficient to find that Griffith committed perjury. Griffith committed perjury if he gave, "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. A "material" statement is one that concerns "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6.

At trial, Griffith committed perjury when he made the statements described below under oath. These statements were false, concerned a material matter, and were made with the willful intent to provide false testimony. *See* PSR ¶¶ 21 & 36. For example, as the Court previously found, video footage introduced in evidence at trial showed Griffith screaming at police officers guarding a broken window near the Senate Wing Doors and shouting, "Open the door!"  Dkt. 142 at 7. As this Court further found, Griffith's testimony concerning his demands that the officers open the door and admit him into the Capitol Building was contradicted by the video evidence.  *Id.*

Likewise, Griffith sought to defend his conduct by testifying that he thought that it was lawful for him to enter and remain in the U.S. Capitol Building and its grounds until instructed otherwise. As this Court previously found, Griffith's testimony fails to "comport with clear video

---

[5] Application Note 4(F) further adds that "providing materially false information to a judge" is another type of conduct that merits the two-level enhancement.

and photographic evidence of a variety of circumstances placing [Griffith] on notice that he was not permitted in the Capitol . . . [and g]iven the numerosity of these signs that [Griffith's] presence in the Capitol was unauthorized, the Court does not credit [Griffith's] assertion that he thought it was lawful to enter and remain in the Capitol building." Dkt. 142 at 8. Griffith's testimony regarding that knowledge is material, as he sought to evade the consequences of his conduct by trying to convince the Court that he did not know his presence at the Capitol was unauthorized.

Finally, as this Court previously observed, Griffith testified in a manner that contradicted his own prior testimony so "as to call much of it into doubt." Dkt. 142 at 9. To cite but one of the Court's examples, Griffith initially conceded some understanding of the role Congress played in certifying the election and that it was meeting on January 6, 2021. He subsequently recanted and insisted that he failed even to realize that "Congress was there and all that." *Id.* Not surprisingly, this Court found it necessary to "discount[] any of Griffith's self-serving statements, [and find] only his inculpatory statements credible because they are supported by other evidence." *Id.* In light of Griffith's incredible testimony, the two-point enhancement pursuant to § 3C1.1 is applicable.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶43. Accordingly, Griffith's Guidelines imprisonment range is 10-16 months' imprisonment. *See* Sentencing Table, U.S.S.G. Chap. Five, Pt. A.

While the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 13 months of incarceration, 12 months supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Griffith's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Griffith, the absence of violent or destructive acts is not a mitigating factor. Had Griffith engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Griffith's case is his multiple entries into the Capitol, even after observing the violence and property destruction there, and the roughly 45 minutes he spent inside the Capitol. Griffith's decision to enter the Capitol building was not a spur of the moment act, but a deliberate choice. Even after he got to the Senate Wing Doors, Griffith had ample time to observe his fellow rioters work to rip the door from its hinges. He then took time to castigate officers guarding the Capitol Building and to demand that they open the door for him. When they did not do so, Griffith went to a *different* entrance (the Parliamentarian door) located

just behind him shortly after other rioters successfully breached it. As he climbed the steps to that door, he shouted with glee at the prospect of finally entering the building.

Having finally entered the Capitol, Griffith was met with disorder: rioters amassed in the hallway, broken glass on the ground, and the utterly ransacked Parliamentarian's office. Despite all of that, Griffith's first impulse, after leaving the Parliamentarian's office, was to try to go deeper still into the Capitol. He only turned around when that way proved impassible, but Griffith was not done. He exited back out of the Parliamentarian's door and, a minute or two later, went right back into the U.S. Capitol building through the Senate Wing Doors. Again, he was confronted with piercing alarms, rioters amassed against a line of police officers in riot gear, and broken furniture. Griffith was still not done; after surveying the room, he proceeded further into the Capitol. Even a police officer telling him that someone had been shot failed to deter him; Griffith kept walking further into the building. Once in the Crypt, he continued to chant.

Griffith's presence and exhortations to the mob contributed to a momentum of violence and lawlessness that encouraged others to acts of violence and destruction. In particular, Griffith was not in the Capitol Building alone. Rather, he traveled 17 hours from Oklahoma and entered the grounds and building with his employee and apprentice Ryals. Indeed, throughout his testimony, Griffith emphasized that he felt responsible for Ryals, that Ryals was still just a kid to him, and that Ryals had been Griffith's employee for years. Ryals may well have been comforted by the knowledge that Griffith—his employer, his mentor, an older man whom Ryals respected and tried to emulate—was right there in the Capitol with him.

Finally, it bears note that Griffith has never once expressed remorse for his actions on January 6. Indeed, shortly thereafter, Griffith told interviewing agents that January 6 seemed to him to be a "jubilation of freedom." At trial, after rewatching video of himself screaming at police

officers at the Senate Wing Doors and demanding that they open the door, Griffith testified that he would not trade one minute of his life for that moment. (3/15/23 Trial Trans. at 668). And, when his own attorneys asked him on direct examination about the consequences of his participation in the riot, Griffith testified that while he did not know that they would be so hard, "it was worth it." *Id.* at 705.

At sentencing, Griffith may finally stand before the Court and express some measure of remorse. Any such sentiments will starkly contradict everything Griffith has said and done before, and the Court should discount those words as but one final effort to evade the consequences of his actions on January 6, 2021. *See United States v. Mazzocco*, 10/4/21 Sent. Tr. at 29-30 "[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.").

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of 13 months incarceration in this matter.

### B.  The History and Characteristics of Griffith

As set forth in the PSR, Griffith had a happy childhood, has been married for over 35 years, and enjoys generally good health. Griffith reported that he was employed at the time of his arrest and remains employed now. PSR ¶67. He has owned his own business since 1994. *Id.* ¶68. Griffith also reported that he has five rental properties which generate revenue, in addition to two residences. *Id.* ¶¶71-74. Griffith has been compliant with his conditions of pre-trial release.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant is perhaps the single factor that weighs most strongly in favor of the government's recommended sentence. Here, Griffith's lack of remorse is deeply troubling; he does not believe that his actions

on January 6 were wrong and so will not on that account be deterred from repeating them. Indeed, he testified that he would not trade one minute of his life for his time at the Senate Wing Doors. (3/15/23 Trial Trans. At 668). Where, as here, Griffith refuses to accept the wrongfulness of his actions, a significant period of incarceration is necessary to deter him from repeating them. On direct examination, Griffith insisted that despite the consequences, "it was worth it." (3/15/23 Trial Trans. 705). At this point, only a significant period of incarceration stands any chance of convincing Griffith that it was not worth it.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".[6]  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Alford*, 1:21-cr-00263-TSC, Alford was also convicted of four misdemeanors following a jury trial. *See* Judgment, *Alford*, No. 1:21-cr-00263-TSC, Dkt. No. 110. The evidence showed that Alford posted on Facebook in the days and weeks leading up to January 6, expressing his belief that the 2020 presidential election was rigged. Alford entered through the Upper House door, through doors and windows that had been broken open by previous rioters. Police in riot gear were nearby and an alarm blared throughout Alford's time in the building but despite officers' attempt to remove rioters from the building, Alford continued. *Id.* at 7-8. Alford engaged in no violence in the Capitol and was not inside the building for a long period of time. Alford was convicted of the same four charges of which the defendant stands convicted. The Government asked the Court to sentence Alford to 13 months incarceration, which was the middle of the Guidelines range of 10 to 16 months. The Court sentenced Alford to 12 months in incarceration, followed by 12 months of supervised release.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of the same four misdemeanor offenses as Griffith after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, Dkt. No. 62. The evidence showed that Rivera livestreamed his presence in the Capitol and "urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, Dkt. No. 69, pg. 5. Rivera announced to his followers that police officers were firing pepper spray at the rioters. *Id*., at 7. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" *Id*. Rivera engaged in no violence in the Capitol and left after approximately 20 minutes. This Court sentenced Rivera to eight months in prison. *Rivera*, No. 1:21-cr-0060-CKK, Dkt. 82. Rivera, unlike Griffith, did not take the stand during his trial, and

so did not testify falsely. Griffith should receive a higher sentence than Rivera in light of his choice to take the stand and testify in a manner that this Court has already deemed not credible. Dkt. 142.

Recently, this Court sentenced Danean MacAndrew to 3 months imprisonment after the defendant was convicted of the same four misdemeanors after a bench trial. *United States v. MacAndrew*, No. 1:21-cr-00730-CKK, Dkt. 59. MacAndrew's conduct on January 6 and personal circumstances differ significantly from Griffith's. Notably, MacAndrew did not shout at officers or enter the Capitol repeatedly as Griffith did.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Griffith was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Griffith to pay $500 in restitution for his convictions on Counts Two and Three. This amount fairly reflects Griffith's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Griffith to 13 months of incarceration, 12 months supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Craig Estes
CRAIG ESTES
Assistant United States Attorney
United States Attorney's Office for the
Massachusetts (detailed to USAO-DC)
Massachusetts Bar No. 670370
craig.estes@usdoj.gov
(617) 748-3100

/s/ Sonia Mittal
SONIA MITTAL
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
Illinois Bar No. 6314706
sonia.mittal@usdoj.gov
(202) 821-9470

## CERTIFICATE OF SERVICE

On this 18th day of August 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Craig Estes*
Assistant United States Attorney
CRAIG ESTES