**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-00244(CKK)** |
| **ANTHONY GRIFFITH,** | : | |
| | : | |
| **Defendant.** | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The defendant, ANTHONY GRIFFITH, through his attorneys, Kira Anne West, and Nicole Ann Cubbage, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After carefully reviewing the final PSR with Mr. Griffith, the defense objects to the following paragraphs:

Paragraph 10: "Mr. Griffith would have observed a line of officers in riot gear attempt to keep the mob from advancing further into lower west terrace…" First of all, Mr. Griffith never saw any officers "attempting to keep the mob from advancing….". "Would have" is not beyond a reasonable doubt. This was never mentioned in the statement he gave to the FBI. And second, probation officer Walters could have asked Mr. Griffith about this in his PSR interview but he did

1

not. And if he had, Mr. Griffith would have told him he did not see this. Additionally, the photo entered in evidence by the government showing a line of officers on the west terrace did not show anything but officers standing in a line. The photo did not show the officers attempting to push the crowd back or the crowd attempting to move forward. Assuming Mr. Griffth saw an attempt by the crowd to overrun the officers, or efforts by the officers to stop this movement, assumes facts that were not proven at trial. Furthermore, the time the photo was taken was in dispute and could not be established to have been taken prior to Mr. Griffith's entry.

Paragraph 11: Mr. Griffith is described as "smiling at its size." Again, there is no evidence of what Mr. Griffith was looking at at this time.  To assume that he smiled only at the large size of the crowd is baseless and was not proven at trial. The only smile that can be interpreted accurately is the one where Griffith smiles at an officer in the Senate Wing Door foyer and the officer smiles in return. There we know what he is looking at and what he is reacting to. Any other attempt to characterize his smile is unfounded.

Paragraph 12:  "He can be seen shouting at a police officer "open the door." This is absolutely false. At trial the officer standing in the window area testified that he didn't have any specific recollection of the individual in the beanie standing at the window. *See* Transcript of Nunn p. 243.  Later he testified that he heard

people in general sayings things like "We love the cops" and What the fuck" but that he tried to remain stoic while they did. *Id.* at p. 252. This officer at the window saw Mr. Griffith praying on the video at the window but didn't recall hearing any of his prayer. *Id.* at p. 268.

Mr. Griffith testified, however, that his words in prayers were for the unborn. *Id.* at 651. Additionally, Mr. Griffith testified that he said "you damn demons don't get to kill no more babies …" and gestured with his hands in a wiping motion. *See* Griffith transcript at p. 802. Video evidence showed that the officer turned to look behind him as if to see where Mr. Griffith was speaking and to whom. This is evidence that his words did not appear to be focused on Officer Nunn at all, but rather to unknown forces Mr. Griffith believed he was addressing. Whether the court believed Mr. Griffith's account or not, the video evidence, and lack of evidence to the contrary leaves the issue of the substance of what was said unresolved. Making a finding that Mr. Griffith said "open the door" to the officer is wholly unsupported by the record. Just because AUSA Estes says that's what Mr. Griffith said doesn't make it so. In fact, Mr. Griffith testified that he did not say that and then a second time he said he didn't think he said that. *See* Griffith Transcript, p. 826-827.

If the government wanted to prove what Mr. Griffith had said at the window, they could have had an expert lip reader read Mr. Griffith's lips. The CCTV

entered into evidence has no audio so any attempt to read Mr. Griffith's lips is pure speculation.  That is why some form of reliable testimony was needed at trial.  Mr. Griffith could then have had the opportunity to cross examine that testimony and defend himself against the false accusation that he yelled "open the door" to the officer.   But the government did not attempt to prove the content of what Mr. Griffith was saying with evidence.  And assuming it to be a proven fact at trial is unfair and improper now at sentencing.

Likewise, it was never proven at trial that Mr. Griffith, in fact, heard what Jerry Ryals said while outside the Senate Wing Doors about having enough people to "overthrow this bitch" in Government Ex. 314.   The only evidence presented to the Court was that Ryals said this, recorded himself doing so on his own phone held closely to his own mouth, and did so while he was looking the opposite direction of Griffith, who is seen for a split second on the video as Ryals pans around the area.  *See* Figure 1 below depicting Griffith on this video.  He never looks at Ryals, never says anything to acknowledge Ryals or his statements. Griffith appears to be filming with his own phone out towards the courtyard and

away from the Senate Wing Doors referenced by Ryals.



*Figure 1*

      To argue that Mr. Griffith heard Mr. Ryals, or worse, agreed with him,

ignores the video itself and the testimony at trial that the area was so loud it was

hard to hear anything and the fact that Mr. Griffith has hearing loss issues.

Moreover, there was no indication on the video whatsoever that Mr. Griffith heard

the statements, i.e. no verbal agreement, no eye contact, no head nodding or any

sign of support or acknowledgement for what *Mr. Ryals* chose to say. (emphasis

added).

      It was also not proven that Mr. Griffith saw the doors ripped off the hinges

at the Senate Wing Door area.  In the very brief second that the doors disengage

from the hinges as seen on video, Mr. Giffith is at a totally different area of the

portico and not even able to see the doors at his height and vantage point.  The Government assumes and argues-just as they did at trial-that  just because things happen in a CCTV video, and Mr. Griffith is depicted in that video someplace, he saw everything in every area that was happening at that time.  In fact, it would be illogical to assume such a thing.  Perspective, vantage point, the defendant's height and location amongst other things all factor in to what he could see or take in at any given moment.   Moreover, The government can't have it both ways.  They argue to this Court that not only did Mr. Griffith see the doors ripped off, but that at the same moment saw what was happening behind him and all around the courtyard.  Additionally, they ask this Court to assume that he heard everyone and everything that was being chanted or said as well.  This was neither proved at trial nor stands any sort of logical scrutiny.   Mr. Griffith should only be held accountable for what the government proved, and there was no proof at trial he heard or saw these things.

Paragraph 15:  Defendant Griffith entered the building but it was never established that he saw the broken furniture.   In fact, video evidence shows that he did not look down at any point while entering and that the room was so filled with people he would have been unable to see anything on the ground anyway.   The evidence at trial was overwhelming that the room was chaotic and filled with

people.[1]  There was no way for Mr. Giffith to see what was on the floor and/or make out the substance of the chants made by others in the room, not himself.  He testified that he didn't remember seeing any furniture or lamp. *See* Transcript, p. 866. What Mr. Griffith said was he saw it after AUSA Estes showed him a video of the area. Mr. Griffith saw it on the video, but he had no independent recollection of it.[2] The only chant Mr. Griffith was shown to have made was in the crypt area and it was the chant of "USA" when he was there with Mr. Ryals.  It was there that Mr. Griffith attempted to follow directions by law enforcement officers out of the building but was ushered around in circles by officers with contradicting instructions, at times pointing one way then back the other.   At every turn Mr. Griffith followed the directions he was given, behaved in a peaceful manner and eventually was directed to an exit where he left peacefully.

Paragraph 17:  Mr. Griffith's testimony about his understanding of the certification of the election is incorrectly stated in the report.  At trial he was asked by the government if he understood what was happening in the building that day, not the details about how an election gets certified or how that would take place in the chambers of the House and Senate.  Griffith testified in general terms about what happened at the Capitol, not the details of the electoral certification  or even a

---

[1] This Court can take judicial notice of this fact from all the other J6 cases it has handled.
[2] The Court may recall AUSA Estes' lengthy cross examination which consisted mostly of AUSA Estes showing a video to Mr. Griffith and then asking him "do you see that?" in an effort to prove that Mr. Griffith saw something he in fact did not see.

rudimentary understanding of what a certification means.  Moreover, there was no

evidence whatsoever that Mr. Griffith sought to find the chambers of either the

Senate or the House of Representatives while inside, understood that anything

might be happening there at the time he was inside or even thought that members

of Congress were still in the building when he walked through the open doors.

Here's what he said on cross examination:

A. I don't think I really realized all -- you know, the --
Congress was there and all that.
Q. Well, we've already had this conversation; right?
A. Yeah, we have.
Q. The Capitol Building is where Congress meets; right?
A. Yes.
Q. Okay. And -- and you knew that they were meeting on that
particular day; right?
A. At that time I don't really know that I knew what was going
on.

     *See* transcript, page 879.

     Paragraph 54: Mrs. Griffith is willing to speak to the probation officer at any

time.

     Paragraph 21: (This was inadvertently labeled "paragraph 84" in our initial

objections yet the Probation Officer, rather than asking for a clarification about an

obvious clerical error in numbering or searching for the word "perjury" in his own

document, chose to ignore this objection as irrelevant).   Mr. Griffith objects to the

use of the word "perjury" and the implication that he has met the legal standard for

having perjured himself.

These allegations by the government are addressed *infra*. The defendant maintains that the offense level is 10 and respectfully requests a variance from the Guideline range.   For the reasons set forth herein, Mr. Griffith requests that this Honorable Court impose a sentence of a period of home confinement,[3] two years probation,  60  hours of community service and $500 restitution to account for:

1. His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building;

2. His lack of bragging or posting on social media about what happened January 6;

3. His amazing commitment to his community and breaking the cycle of poverty in his family;

4. His long history of a strong work ethic which has allowed him to be a productive member of society; and

5. To avoid disparate sentences in similar cases.

## I.    **Background**

Mr. Griffith  voluntarily spoke to the FBI when they came to his home

---

[3] 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

and gave a detailed statement of the offense in which he admitted that he entered the U.S. Capitol building long before he was charged.  He also gave the FBI information about his co-defendant, Jerry Ryals.  Mr. Griffith walked out of the building as directed, he did not cause any damage while inside or outside, nor did he engage in any violence at all. He did not enter the House or Senate Room floor, nor did he engage in actively encouraging violence. This Court puts great emphasis on the fact that he yelled "freedom" while walking down Constitution Avenue. Respectfully, not only did Mr. Griffith admit that on the stand when he testified, it's completely legal conduct protected by the First Amendment.  He was not encouraging others to protest at the Capitol, to commit violence or to act in any unlawful manner.  He never even intended to go into the Capitol. Additionally, Mr. Griffith gave the FBI his phone and cooperated with them before getting a lawyer. When this Court considers the behavior of other criminal defendants charged with crimes stemming from January 6, 2021, the Court will find that Mr. Griffith should not go to the penitentiary.

### A. Media reports of stolen election

Many claims were made on multiple media sources that the election system had been corrupted and that the integrity of the election should be questioned.

.

People like Mr. Griffith-a high school graduate and life-long blue collar worker, stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021

This Court can only understand why Mr. Griffith came from Oklahoma to D.C. to attend the Trump Rally by taking into account the enormous influence the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.   Mr. Griffith brought his helper and an elderly friends with him simply to attend the speech. There is absolutely no evidence to indicate he had plans to enter the Capitol or commit any violence that day.

Mr. Griffith, like millions of other Americans, tried to make sense of the media coverage surrounding the events of 2020 and especially the election results. Mr. Griffith similarly had strongly held beliefs after the Presidential election that there had been irregularities in the election.  So when he heard about the rally at the Ellipse, Mr. Griffith was interested in attending and showing his support President Trump.  He supported Trump and he felt that America was on a better path with Trump as president.  This included Mr. Griffith's strongly held beliefs about abortion rights.  In fact, there were people at the Trump rally with all types of agendas that day.  Mr. Griffith saw signs for pro-life groups, anti-vaccine groups, Anit-communist China groups and people who just seemed dressed to make a scene and get noticed.

As we have learned through the hearings that have taken place and through other investigative reports, such as the one from the New York Times linked herein, there were two types of protestors in the crowd on January 6th. https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Griffith, were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



*Figure 2*

The plan depended on creating chaos and whipping up the "normies" into a patriotic frenzy.  The Proud Boys intended to use the large crowd to distract and overwhelm as they went to the work of breaking into the Capitol.   People who fell

into the "normie" category were there to participate in a First Amendment protest, not a riot.

Mr. Griffith had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine. This 58 year old Oklahoman, with a sincere belief and faith in President Trump, was a perfect pawn for the agitators in the crowd. Consider that it took the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years of investigation, to parse through to what they believe is some truth about what transpired that day. How could Mr. Griffith, or any "normie" that day have known what was to happen? He came to the Capitol with no intent to do anything but add his voice in support for President Trump and to pray for the lives of the unborn as was his passion and a mission he felt called to do. He had asked the Lord for guidance and the felt called to pray. He did not suit up for combat. He did not obscure his face. He was not armed. He wore street clothing. He did not carry anything. He came with friends, one who was over 70 years of age and not able to walk very well, not as part of an organized group looking to stir up trouble. He committed no violent actions in his walk through the Capitol. In fact, he attempted to follow his apprentice, Mr. Ryals, making sure he kept him in line. He treated law enforcement officers with respect. He did not destroy anything. His desires were innocent, with no intent to commit any sort of crime.

Unfortunately, he now understands that going into the Capitol that day was not allowed and that being there is considered trespassing

## THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

### A.  Mr. Griffith's trip to D.C. and his walk to the Capitol

Mr. Griffith believed what he read on the internet. He believed that there was wrongdoing in the State of Georgia.  He also believed that he should show his support for the soon to be former President by attending his rally scheduled for January 6, 2021, at the Ellipse on the Mall.  At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech and the crowd headed toward the Capitol,  did he have any intention of  going anywhere other than the Ellipse area.   Mr. Griffith followed the large crowd there that day with no intention of doing anything but seeing the President.

### B.  Mr. Griffith's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[4] Officers were able to hold off the excited crowd for

---

[4] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach was well before Mr. Griffith actually entered the Capitol. Hundreds preceded him in entering. Video shows that Mr. Griffith kneeled in prayer at a window outside the Capitol for many minutes when he was first close enough to see inside. Curiously, even though this was brought out repeatedly in trial and during the PSR interview with the probation officer, there is no mention of this in the PSR.

Mr. Griffith was not in this first wave of protesters to reach the building after the officers on the steps were overwhelmed and retreated, nor was he ever there to see this at a distance. By the time he made his way up to the upper terrace of the west side of the Capitol, there was no fighting or police interaction to be seen. *See* picture below from Defendant's Ex. 313 showing the upper west terrace at 2:37pm, approximately the same time Mr. Griffith is praying at the window. No officers are outside in the courtyard at this time and the people are standing around waving flags. It should be noted that the Senate Wing Doors are not visible at this distance and are obscured by arches of brick (shown below) until you are much

closer to them.



*Figure 3*

By the time Mr. Griffith reached the window area under the arch (circled in figure 3), people had gathered outside the Senate Wing Doors again which had previously been breached earlier in the day.  The doors were closed now, but the window that had been broken through earlier was still open and through it Mr. Griffith could see officers standing inside.  He knelt there and began to pray.  *See*

figure 4 below taken from gov. Ex. 403 at 2:37:36pm.



*Figure 4*

After his prayer, Mr. Giffith stood there for a short time and then turned around and faced the opposite direction.   When he turned, he could see others moving towards open doors across the courtyard.  These doors are referred to as the Senate Fire Doors.   Mr. Griffith did not see how they were opened as his back was to them at that time.  He could now see the people lining up the steps and entering freely through those Senate Fire doors across the courtyard at a rapid pace.  He moved that direction and made his way up the stairs and entered inside at approximately 2:46:17pm.  *See* Figure 5 below from Government's exhibit 404.



*Figure 5*

Mr. Griffith had been praying at the window and could not see how the door behind him and across the very crowded courtyard was opened or who opened it. Mr. Griffith was not violent as he made his way up the steps to those doors, but curious to follow the crowd inside and excited that they were being allowed to enter. He filmed as he walked in and seemed focused on the phone in his hands rather than on looking around. He was peaceful and followed the crowd.

Upon entry, he turned into the first open door to his right (The Parliamentarian's Office) where people were filing in ahead of him. He was upset with the mess he encountered and went out of his way to tell another protestor not to destroy things. Griffith stayed only 1 minute 11 seconds in that room. He then exited out the same door he entered and followed the crowd down the hallway only

to exit the area back out the entry doors at approx. 2:48:53.  In total Mr. Griffith

spent roughly 2 minutes and 45 seconds inside the Capitol at this time.

When Mr. Griffith exited the Senate Fire Doors at approximately 2:48:53 he

was working against the flow of traffic.  His small stature did not afford him a

particularly good line of sight amongst the crowd or out the door.  But once he was

outside, Griffith noticed that people were moving in towards Senate Wing Doors

up the ramp set up outside.  Unbeknownst to Mr. Giffith, while he had been inside

the Senate Fire Doors, people outside the Senate Wing Doors had pushed their way

inside those doors against the resistance of officers.  *See* Figure 6 below from

Gov't Ex. 403 showing approximately the time the crowd made their way in at

2:48:44pm.  Mr. Giffith did not and could not physically view this scene.  There

was no evidence presented at trial that showed Mr. Griffith had any knowledge of

this scene or that people had forced themselves inside against the resistance of

officers.



*Figure 6*

Mr. Griffith could not see this happening inside the doors and had no part in this surge to overcome the officers at this door.  He only saw a crowd forming and walking up a ramp to the doors and followed behind.  The stone pillars outlining the arch around the windows not only obscured the Senate Wing Doors from sight, but also formed a natural path that people followed to enter inside and up a ramp. By the time Mr. Griffith made his way to those Senate Wing Doors, the crowd was freely walking through the open doors.  *See* Figure 7 below of Gov. ex. 403 at 2:50:37pm as Griffith enters peacefully amidst a crowd of a multitude of others

who had come in before him through these now open doors.  He entered alone.



*Figure 7*

Once inside, Mr. Griffith made his way directly to the back of the room and stood next to officers lining the back of the area.  He stood there for many minutes. No broken furniture or glass is visible on the ground as he entered or where he stood for many minutes.  Video evidence admitted at trial (specifically Gov. ex. 403) shows that Mr. Giffith looked up or at his phone the whole time as he entered the area, therefore he could not have seen these things.  He engaged with the officers in a friendly manner.  Testimony at trial established that the officers never told him to leave the area or that he was trespassing.   In fact, the "verbal judo" used by officers was to create a welcoming atmosphere and not to engage or escalate the situation by asking people to leave.  In response to this welcoming

atmosphere expressed by the officers, Mr. Griffith smiled and tried to offer

encouragement during his time there.  *See* Figure 8 from Defendant's exhibit 506

below depicting Mr. Griffith's demeanor and attempts to be supportive to law

enforcement that day and the smile by the officer in return.



*Figure 8*

After standing in the foyer for many minutes, Mr. Griffith followed the

crowd down the hallway towards the Crypt.  He made a turn into a stairwell along

the way and encountered an officer who told Mr. Griffith not to go up the stairs.

Mr. Griffith willingly complied with this order and offered encouragement to the

officer through a pat on the back.   The officer did not tell Mr. Griffith to leave the

building, only that he should not go upstairs.   Mr. Griffith complied willingly with

these orders.  Mr. Giffith left the area and headed down the hallway towards the

Crypt. *See* Figure 9 from Defendant's exhibit 204 below at 3:02:27pm.



*Figure 9*

      Once in the Crypt, Mr. Griffith was reunited with Mr. Ryals for a brief time

period.  Thereafter he spent several minutes following the directions of officers up

and down hallways inside this area looking for an exit.  Griffith did not know

where they were sending him, but he willingly followed.  The officers were finally

able to determine an exit door and direct people towards it after first having sent

them down the hallways several times.  Mr. Griffith was then pointed in the right

direction to leave the building along with many others who had been wandering the

hallways at the direction of the officers.  His wandering during that time did not

reflect an intent to remain inside the Capitol, rather a desire to follow instructions

from law enforcement when told what to do.  His eventual exit at approx. 3:33pm

was peaceful and part of a steady flow of others who had been trying to exit as

directed.   Figure 10 below shows Mr. Griffith exiting the building peacefully and

at the direction of officers.



*Figure 10*

### C. Hindsight is 20/20.

Days later, without counsel present and without the benefit of a Miranda

warning, he was interviewed by the FBI.  Mr. Griffith's statement in their

interview 302 was truthful and told his story of being at the Capitol.[5]   The FBI

agents that wrote this report never stated that he was in any way insincere or lying

about the facts. He never once refused to answer their questions.

Mr. Griffith has absolutely no history of political extremism.  He had

absolutely no expectation or knowledge of the consequences of others' actions that

day, nor the consequences that their actions would have on his being present.  He

was supporting the President in what he believed were legitimate efforts to claim

victory in the Presidential election.

While he did not personally destroy anything, this Court found that he

illegally played a part in an unmanageable mob.  According to Ed Maguire, a

criminologist at Arizona State University, security forces are trained to ignore

yelled insults and small acts of hostility, like pushes and thrown water bottles. And

they receive training in absorbing surges in a crowd, moving people as gently as

possible, and quickly responding to pockets of violence and isolating agitators.

Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12,

2021), available at  https://www.nytimes.com/2021/01/12/science/crowds-mob-

---

[5] In determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior after the initiation of the criminal case, rather than prior to a defendant's arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.), sentencing level reductions for acceptance of responsibility apply to a defendant's action in pleading guilty after the initiation of the case. U.S.S.G. § 3E1.1.   Defendants are not given a more punitive sentence under the U.S.S.G.  if they do not indicate remorse prior to filing of the initial charges.  Evidence of remorse after initiation of criminal charges is key.  This makes sense, as it allows time for the defendant to reflect on the evidence, and his own conduct.  This encourages reflection and review, and focuses on the defendant's actions after a defendant has availed himself of his constitutional right to counsel through the initiation of the prosecution of the case.

psychology.html  Mr. Griffith did not commit any of those actions.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." _Id._

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." _Id._  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… " There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." _Id._

Unfortunately, Mr. Griffith followed a large crowd rather than leave, not knowing how violent as a whole the mob would be independently of his own actions. Others, who were also part of the mob, had different and more violent plans that day of which Mr. Griffith is now being associated with.

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[6]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A.  Nature & circumstances of the Offense & the History and Characteristics of Mr. Griffith

First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second,  Mr. Griffith did not attempt to add to the

---

[6] 1.    The nature and circumstances of the offense and the history and characteristics of the defendant;
2.    The need for the sentence imposed;
3.    The kinds of sentences available;
4.    The kinds of sentence and the sentencing range…;
5.     Any pertinent policy statements issued by the Sentencing Commission;
6.    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.    The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

violence of the mob. For example, he didn't chant "whose house, our house" like literally thousands of other protesters.   Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. In fact, the photo shown *supra* shows Mr. Griffith smiling at law enforcement.

 Fourth, Mr. Griffith did not destroy or steal any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for about a 1/2 hour.  The defense is not aware of any evidence that he entered the Senate or House Chamber.

The government must concede that he committed no violent acts and destroyed no property, even though he may have been in the proximity of others doing such things. His actions within the Capitol have been tracked on the CCTV footage and this footage demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property or commit violent acts.  He did not suit up for combat.  He did not obscure his face.  He was not armed.  He did not yell at any police officers as has been described by the Court and the government. Rather, he yelled that there would be no more killing of babies, and his voice was not aimed at any police officer. He wore everyday clothing.  By the time Mr. Griffith arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial.  He met no resistance

in his walk to and inside the Capitol. At the time,  Mr. Griffith didn't dream he'd be charged for going into the Capitol.

He spoke to the officers and  the FBI freely and voluntarily when he turned himself in.  Without representation of counsel, he fully acknowledged  his misconduct by answering pointed questions by multiple FBI agents  and expressed true and full contrition for his actions.  He was relieved by the opportunity to take responsibility for his actions.  He has never violated  his conditions of release.   He did not post anything on social media or brag to friends after January 6.

This has obviously been a tough road for Mr. Griffith and his family.   He has a very simple life: he works hard and tries at every turn to improve himself, support his family, and be a servant of God. He has no criminal history.  Yet he has suffered and been called out for his January 6 attendance at the Capitol in ways that cannot be undone.  He has been called names and accused of things as a result of his name being associated with Trump and the January 6th violence, even though he was not part of that violence.  The events of that day live on in social media.  It will be there forever and Mr. Griffith will forever carry the taint of having been convicted of a crime associated with those events.  He lost a very good job as an electrician  that he'd had for 25 years. People he used to work for won't even talk to him anymore. He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. He's been threatened and called

a pedophile. His personal character and reputation will forever be tarnished.  In sum, he has been punished already by his actions.

Mr. Griffith does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo.  In determining what punishment is warranted, this Court should not lose sight of the fact that he did no harm, intended no harm, and has lived a life without any criminal conduct.  His past behavior and his post arrest behavior show that he is capable of being a very productive, law abiding citizen and the Court can rely on that as a basis to sentence him to a term of house arrest and probation considering the 3553 factors.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not

promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A sentence of home detention does constitute punishment and it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. He has been on pretrial release for over a year with many restrictions and has complied with them completely. The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Griffith's likelihood of recidivism is really non-existent. His acceptance of responsibility was swift, complete and without reservation and exercising one's constitutional right to go to trial should not be used against him. Research has consistently shown that while the certainty of being caught and

punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id.*; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Mr. Griffith's  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come.[7] A punishment of any jail time in

---

[7] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S.

this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Mr. Griffith urges the Court to impose a sentence of home detention in this case in light of his sincere and complete remorse, his non-violent conduct at the Capitol, and his cooperation with the FBI, and the lack of a need to further deter him.

### 3. Just Punishment

Particularly during this alleged post-pandemic, it is best for the community, as well as for Mr. Griffith, that he continue his service to the community outside of prison. He has a conviction which, in and of itself, is quite punitive. The conviction caused him to lose his job, affects possible future job opportunities, and will remain with him for the rest of his life. But home confinement will allow him to continue to work, show remorse and to help support his family - both financially and emotionally. If incarcerated, he would lose what's left of his job.

Probation involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer

Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

to visit their homes and jobs at any time, and follow the officer's advice.  *Jones*

*v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep

good company and good hours, work regularly, keep away from undesirable

places, and live clean, honest, and temperate lives.  *Ibid*.  Not only must they

faithfully obey these restrictions and conditions, but they also live in constant

fear that a single deviation, however slight, might result in being sent to prison.

*Ibid*.

Defendants might be rearrested any time the probation officer only believes

they have violated a term or condition of probation.  *Ibid*.  They might have to

serve all of the time that was suspended with few, if any, of the procedural

safeguards that normally must be provided to those charged with crime.  *Ibid*.

Probation significantly restrains defendants' liberty to do the things that free

people in this country are entitled to do.  *Ibid*.

## B. <u>The kinds of sentences available</u>

A sentence of   incarceration would result in sentencing disparity with other

individuals who behaved similarly but were not similarly charged .  <u>*See infra*</u>.[8]

Imposition of a fine is discretionary, and, defendant respectfully submits,

can be ordered in this case.  Defendant's financial condition is modest as outlined

---

[8] This does not include every case, just a sampling.

in the PSR and he respectfully submits that he can pay a fine that this Court thinks is appropriate for his conduct.

The probation officer asks this Court to impose one enhancement. With regard to the 2 level obstruction enhancement under USSG 3C1.1, the Court can dismiss this quickly. Nothing Mr. Griffith testified about was a materially false statement nor did any statement obstruct or impede any official investigation or prosecution in this case. This Court found Mr. Griffith not credible, not that he committed perjury.

### C. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than home confinement, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing or are pending in this Court. Given sentences imposed in comparative cases, a sentence of home detention and probation is not unusual for misdemeanor cases and even some felony cases and is appropriate here. Last month, this Court sentenced Gabriel Chase on the 5014 parading charge and he received no jail time and a sentence of 36 months probation. *See USA v. Chase*, 23-0018(CKK). In this case, Mr. Chase was far more of a bad actor than Mr. Griffith. For example, Mr. Chase was directed by officers to leave the Capitol, but he did not. Mr. Griffith did. Mr. Chase pushed past officers. Mr.

Griffith did not. He went into Nancy Pelosi's office. Mr. Griffith did not. He

was part of a radicalized group called "America First." Mr. Griffith was not.

Mr. Chase made it to the Senate chamber. Mr. Griffith did not. Even after he

left the Capitol, Mr. Chase went to the media equipment area and engaged with

others in destroying property. Mr. Griffith did not. Yet, the government asked

for a sentence of merely 60 days and they are asking for a year here. Mr. Chase

was charged with the exact 4 misdemeanors Mr. Griffith was. And although his

conviction is for a class B misdemeanor, Mr. Chase's conduct compared to Mr.

Griffith's is night and day. This Court should take that into account here.

The following cases are a sampling where a class B misdemeanor was

charged and pled to and resulted in little to no incarceration with facts that often

were more egregious than Mr. Griffith's:

**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF
Nos. 42 & 44 (sentenced to supervised release with home confinement even though
Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied
media accounts of violence were accurate, minimized the conduct of all of the
rioters, 3) called for a revolution even after the events of January 6, 4) encouraged
the rioters to be proud of their actions, and 5) minimized the impact of that day on
lawmakers and democracy. Judge Hogan imposed a probationary sentence with a
short period of home confinement for Ms. Bustle and an even shorter period of
home confinement for Mr. Bustle. The government recommended probation in this
case.
**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three
months home confinement and two years' probation). According to the
government, who recommended probation with a short term of home confinement,
Mr. Bennett espoused conspiracy theories about the election, was an admirer,
albeit not a member of the Proud Boys, and boasted about his conduct. According
to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but

rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.[9]

 **_United States v. Weisbecker_, 21 CR 682(TFH) Judge Hogan ordered 30 days of intermittent confinement as a condition of 24 months' probation.  Mr. Weisbecker's conduct and treatment towards law enforcement was much more severe than the instant case. He entered the Speaker's suite of offices, he posted multiple videos and photos on Facebook and other media cites for days,  and repeatedly berated federal border patrol officer at checkpoints multiple times. The language is so bad it can't be repeated.

***_United States v. Carlton_, 21 CR 247 (TFH), Judge Hogan sentenced the defendant to 36 months' probation. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. _See  Gov't sent. Memo,_ ECF No. 47, p. 2. Mr. Wood engaged in none of this conduct.

** _United States v. Reeder,_ 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy.

---

[9] None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify.

Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.

In *United States v. Youngers*, 21 CR 640 (TFH), Judge Hogan again gave a

probationary sentence despite that defendant's conduct as outlined by the

government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer. Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol. Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.
Read more at: https://www.kansascity.com/news/politics-government/article268291057.html#storylink=cpy

Where a defendant pled to a class A misdemeanor charge:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yell "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.
**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were

"a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. See ECF 17.

**United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so

brazen that he was one of the few protesters arrested on the scene. Id., p. 9.

Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government

sought a sentence of 27 months' incarceration. Id., p. 2. The Court imposed a

sentence of six months' incarceration with credit for time served, followed by 24

months of supervised release.  Mr. Griffith's conduct was nowhere near this.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021).

Carrying a Confederate flag, Blair walked up to a police line outside the Capitol.

He turned towards an officer and said, "What's up motherfucker, what's up, what's

up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the

defendant jabbed him with a lacrosse stick. Id. A search incident to arrest

recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair

pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five

months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted

as intended to inflict bodily injury or to threaten it.

All told, the facts of the offense conduct and characteristics of the

defendants who garnered little or no incarceration  and were charged with only

misdemeanors were starkly different than Mr. Griffith's conduct and

characteristics.  His  culpability appears to be minimal in contrast with rioters who

posted hateful messages, destroyed or stole government property and assaulted or

threatened the law enforcement officers on that date.

This Court should look to a spectrum of aggravating and mitigating factors,[10] to include: (1) whether, when, how the defendant entered the Capitol building; *through an open door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not. He was a follower, not a leader.* (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he tried to get out of the Capitol and away from violence and chastised those that were destroying things* (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *A little over an 1/2 hour*; (7) the defendant's statements on social media; *none;* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials;  *cooperated at the Capitol, when initially questions by the FBI and again later when he was arrested;* (9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated sincere remorse.  Mr. Griffith will be writing a letter to the Court which he will read in court at sentencing.*   While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Rather,

---

[10] This are factors then Chief Judge Howell implemented in her J6 cases.

this Court should mete out a punishment commensurate with the behavior of Mr.

Griffith compared to other rioters that day.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Griffith

respectfully moves this court to impose a sentence of  home confinement, 24

months probation, 60 hours of community service,  and $500 restitution.  This

sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C.

§3553(a).  It would be a sentence in the best tradition of federal judicial discretion,

that would consider Mr. Griffith as an individual and account for his unique

failings and positive attributes that, in the words of Justice Kennedy "sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v.*

*United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United*

*States*, 116 S.Ct. 2053 (1996).

Respectfully  submitted,


By:   _____/s/  *Kira A. West*_____
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


By:

/s/ *Nicole Cubbage*

Nicole Cubbage
DC Bar No. 999203
712 H. Street N.E., Unit 570
Washington, D.C. 20002
703-209-4546
cubbagelaw@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 18th day of August, 2023 a copy of same was delivered to the parties of record pursuant to the rules of the Clerk of Court.

*Kira West* /S/

Kira Anne West